**James R. ADAMS et al.,**
**Plaintiffs-Appellants,**

v.

**Reuben O'D. ASKEW, as Governor of**
**the State of Florida, et al.,**
**Defendants-Appellees.**

No. 73–3927.

United States Court of Appeals,
Fifth Circuit.

April 21, 1975.

---

Charles R. Holley, Naples, Fla., Jack F. White, Jr., Clearwater, Fla., for plaintiffs-appellants.

Robert L. Shevin, Atty. Gen., of Fla., J. W. Chalkley, Jerry E. Oxner, Asst. Attys. Gen., Dept. of Legal Affairs, E. Burke Jolly, Asst. Gen. Counsel, Tallahassee, Fla., for defendants-appellees.

Before DYER, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

Plaintiffs-appellants, James R. Adams, James B. Sanderlin and Jack Murphy brought suit below as a class action on behalf of all candidates for state office in Florida who qualified in 1972 by paying the filing fees imposed by Fla.Stat. Secs. 99.061, 99.092, 103.121 and 105.-031(3), seeking both a declaratory decree under Title 28, U.S.C., Sec. 2201 that the statutes were unconstitutional, and a refund of the filing fees.[1] Jurisdiction was invoked pursuant to Title 42, U.S.C., Sec. 1983 and Title 28, U.S.C., Sec. 1343.

Fla.Stat. Secs. 99.061, 99.092, and 103.-121 required candidates for nonjudicial state offices to pay a filing fee of up to 5% of the annual salary of the office sought, 3% going to the state and 2% going to the candidate's political party unless reduced by the party executive committees.[2] Named plaintiffs and the class they represent were able to pay and did pay the filing fees without any asserted undue burden on their financial resources.

The district court held that the Florida statutes were constitutional on their face and as applied to plaintiffs and dismissed the complaint for failure to raise any substantial constitutional issue. We affirm.

1. The statutes involved in this suit have been amended. See Fla.Stat. Secs. 99.092 et seq. (1974). The validity of this new statutory scheme is not before us.

2. Appellants did not seek refunds for amounts paid the political parties.

Plaintiffs presented to the court below and urge on appeal three challenges to the 1972 Florida scheme: (1) the Florida statutes were unconstitutional under Bullock v. Carter, 1972, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 and Lubin v. Panish, 1974, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702, because they failed to provide an alternative means for candidate access to the ballot for those able but unwilling to pay the statutory fee; (2) the Florida statutes, by failing on their face to provide an alternative means of qualifying for indigents, a class constitutionally exempt under *Bullock* and *Lubin,* were void and unconstitutional as to all in spite of a three-judge court order then in effect in *Fair v. Taylor,* M.D.Fla.1972, 359 F.Supp. 304, vacated 1974, 416 U.S. 918, 94 S.Ct. 1916, 40 L.Ed.2d 276, enjoining the exaction of fees from indigent candidates; and (3) the Florida statute requiring a filing fee from candidates running in nonpartisan judicial elections is arbitrary and serves no valid governmental interest. We deal with each challenge in turn.

Plaintiffs first assert that the Supreme Court decisions in *Bullock* and *Lubin* required Florida to provide an alternative means of access to the ballot for those potential candidates who were able but simply unwilling to pay the required fee. They distill from these cases the rule that, regardless of indigency, any kind of filing fee other than a processing fee is unconstitutional per se, unless an alternative means of access to the ballot is provided by statute.[3]

The district court ruled that plaintiffs misunderstood the constitutional thrust of *Bullock* and the order entered in *Fair.* We agree. Under the reasoning of *Bull-*

*ock* and the recent Supreme Court decision in *Lubin,* decided subsequent to the dismissal below, we hold that plaintiffs are not entitled to a refund because the State of Florida was not constitutionally compelled to provide candidates able to pay the filing fees another route to the ballot.

In *Bullock* and *Lubin,* indigent candidates and their voting supporters successfully challenged fee systems which excluded their effective participation in the political process solely because of their indigency. Contrary to plaintiffs' assertions, however, the Supreme Court did not hold in either case that all filing fees exceeding processing costs are unconstitutional per se. Indeed, the Supreme Court specifically stated in *Bullock* that,

It must be emphasized that nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees . . . in other contexts.

405 U.S. at 149, 92 S.Ct. at 859, 31 L.Ed.2d at 103. What the Court did hold was that States may not exact filing fees that are "so patently exclusionary as to violate traditional equal protection concepts", *Lubin,* 415 U.S. at 715, n. 4, 94 S.Ct. at 1319, 39 L.Ed.2d at 708, commenting upon the holding in *Bullock,* and that

in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

*Lubin,* 415 U.S. at 718, 94 S.Ct. at 1321, 39 L.Ed.2d at 710.

These decisions were bottomed upon the Supreme Court's assessment of the impact of the fee system upon voters.

---

**3.** Plaintiffs acknowledge that footnote 29 in *Bullock* supports the imposition of a processing fee.

This would be a different case if the fees approximated the cost of processing a candidate's application for a place on the ballot, a cost resulting from the candidate's decision to enter a primary. The term *filing* fee has long been thought to cover the cost of filing, that is, the cost of placing a particular document on the public record.

405 U.S. at 148, 92 S.Ct. at 858, 31 L.Ed.2d at 102. They attack the fees collected in 1972, however, because they exceed the cost of processing the application. They point out, for example, that a candidate for legislative office could be assessed $600 while a candidate running for circuit judge in the same geographical area could be assessed $1600 solely because the fee varies with the salary of the office sought.

Because the right to vote is a "fundamental" one, see Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081–82, 16 L.Ed.2d 169, 172–73, where the fees exacted have "a real and appreciable impact on the exercise of the franchise", based solely upon lack of wealth and inability to translate voter support into dollars, a strict standard of review is to be applied. *Bullock,* 405 U.S. at 144, 92 S.Ct. at 856, 31 L.Ed.2d at 100; see Harper v. Vance, N.D.Ala.1972, 342 F.Supp. 136, 142. In *Lubin,* the state's legitimate interests in limiting the size of its ballots and insuring that only serious candidates appeared on the ballots conflicted with the right of voters whose effective participation in the political process was substantially impaired by the absolute disqualification of serious but indigent candidates. The fee system, which provided the *sole* method of access to the ballot, could not withstand strict scrutiny where less restrictive means of control were available to the state.

■■ Unlike the rights of voters, the right to candidacy has not as yet been accorded fundamental status. *Bullock,* 405 U.S. at 142–43, 92 S.Ct. at 855, 31 L.Ed.2d at 99. Nor does the mere existence of limitations affecting the exercise of the right to vote compel close scrutiny. *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856, 31 L.Ed.2d at 99. Plaintiffs' only hope of invoking a strict standard of review rests upon their ability to show impairment of the rights of voters, a matter which they failed to assert. But even if they had in fact asserted adverse voter impact and advanced their own interests as voters, strict review under the circumstances would still be inappropriate.

Plaintiffs fail to recognize that there exists a qualitative difference in the impact on voters of mandatory filing fees assessed candidates able but unwilling to pay and candidates unable to pay. In the latter situation, the statutory scheme without more denies indigent candidates the right to run for office and thus may operate to deprive poorer voters of the opportunity to vote for candidates of their choice.[4] In the former, however, it is not the statute which perforce restricts the ballot but the candidate's decision to pay or not to pay as a prerequisite to having his name placed on the ballot. The difference in ability to exercise discretion in determining whether to seek a place on the ballot is crucial. The indigent lacks this choice, which the nonindigent can and does exercise.

■ Voters' rights are not infringed where a candidate chooses not to run because he is unwilling to comply with reasonable state requirements. They are no more affected by a candidate's unwillingness to pay a reasonable filing fee than they are when he refuses to comply with financial disclosure laws, or, for that matter, a reasonable petitioning requirement. See Mathews v. Little, 5 Cir. 1974, 498 F.2d 1068. The *Bullock* Court was concerned with "disparity in voting power based on wealth", 405 U.S. at 144, 92 S.Ct. at 856, 31 L.Ed.2d at 100, whereby affluent voters have access to the ballot or can ensure placement for their favorites, but less affluent voters do not and cannot. *Id.* When indigent candidates have access, through a petitioning process or otherwise, this disparity ceases, and with it the need to invoke a stricter standard of review also ceases.

■ The fee requirement withstands constitutional attack under the rational

---

4. Many potential office seekers lacking both personal wealth and affluent backers are in every practical sense precluded . . . no matter how qualified they might be, and no matter how broad or enthusiastic their popular support.
  *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856, 31 L.Ed.2d at 100. Further, "While qualifying schemes do not expressly prohibit indigents from becoming candidates, in effect, because the exercise of rights of candidacy is conditioned on a monetary payment, the classification is quite similar to an express prohibition." Comment, The Constitutionality of Qualifying Fees for Political Candidates, 120 U.Pa.L.Rev. 109, n. 31 at 112 (1971).

basis test. Requiring a fee of nonindigent candidates is a rational means of furthering the state's interests in regulating the size of the ballot, avoiding voter confusion and clogging of election machinery, assuring that the winner is the choice of at least a strong plurality of voters while avoiding runoff elections, limiting the ballot to serious candidates, and defraying expenses. See *Bullock*, 405 U.S. at 145, 147, 92 S.Ct. at 857–58, 31 L.Ed.2d at 100–101, 102; *Lubin*, 415 U.S. at 712–13, 715–16, 94 S.Ct. at 1318, 1319, 39 L.Ed.2d at 706–707, 708. As the Supreme Court noted, "There may well be some rational relationship between a candidate's willingness to pay a filing fee and the seriousness with which he takes his candidacy," where he has adequate resources. *Bullock*, 405 U.S. at 145–46, 92 S.Ct. at 857, 31 L.Ed.2d at 101 (footnote omitted).[5]

■■ Plaintiffs next contend that the Florida statutes, by failing on their face to exempt or provide alternatives for indigents, were void in toto and for that reason could not be applied to them. They argue that only the Florida legislature could correct this supposed defect, and regard as inconsequential the three-judge court order in effect during the 1972 elections, providing a petitioning process for indigent candidates.[6]

Plaintiffs lack standing to assert the rights of indigent candidates and voters, adequately protected by the order in effect in 1972 in *Fair*. See Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947; Tileston v. Ullman, 1943, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603. They also confuse an attack on the constitutionality of a statute on its face with an attack on the statute as applied. As discussed above, the Florida statutes were not unconstitutional on their face, nor as applied to the present class of plaintiffs.

■ A federal court has

"no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies . . . ." [O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

United States v. Raines, 1960, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524, 529. The rationale for the rule may disappear

where the statute in question has already been declared unconstitutional in the vast majority of its intended applications, and it can fairly be said that it was not intended to stand as valid, on the basis of fortuitous circumstances, only in a fraction of the cases it was originally designed to cover. (Citation omitted) The same situation is presented when a state statute comes conclusively pronounced by a state court as having an otherwise valid provision or application inextricably tied up with an invalid one. (Citation omitted); or possibly in that rarest of cases where this Court can justifiably think itself able confidently to discern that Congress would not have desired its legislation to stand at all unless it could validly stand in its every application.

362 U.S. at 23, 80 S.Ct. at 523–24, 4 L.Ed.2d at 530.

None of these exceptions or others referred to by the Court in *Raines* nor any others that come to mind, require us to hold the statutes unconstitutional in their entirety. Without serious doubt,

---

5. See Harper v. Vance, N.D.Ala.1972, 342 F.Supp. 136, 143, where the Court recognized that, "Requiring a fee of those able to pay it may help discourage some financially secure, frivolous candidates," and that "lack of seriousness may well be inferred where one is able, but merely unwilling, to pay a fee."

6. Fair v. Taylor, M.D.Fla.1972, 359 F.Supp. 304, vacated 1974, 416 U.S. 918, 94 S.Ct. 1916, 40 L.Ed.2d 276, held that the Florida statutory scheme presently under attack was unconstitutional as applied to indigents and entered an order requiring nonindigent candidates to pay and providing indigents an alternative petitioning process.

the Florida legislature desired the statute to be applied to its fullest constitutional reach even if inapplicable to indigents. See Fla.Stat. Secs. 99.092 et seq. (1974), providing a petitioning process for indigents but continuing to exact fees from nonindigents.

■ Finally, plaintiffs attack the assessment of qualifying fees upon judicial candidates. They argue that there can be no justification whatsoever for assessing any fee against candidates for judicial office. None of the fees collected was channeled to political parties because the elections are nonpartisan. The ballot, they believe, was already restricted because most candidates must be attorneys and only candidates who have been members of the Florida bar for over five years are eligible to qualify for more than one-half of the judicial offices. Appellants infer from these facts that the fee was no more than a tax on the right to run for judicial office. Further, they contend that judicial candidates were severely hampered by the Florida Standards of Judicial Conduct [7] and by Florida Statutes 105,[8] in their ability to solicit funds, allegedly a great-

er disability than that facing indigents assessed a fee.

We fail to see any persuasive distinction in the constitutionality of a fee charged candidates running in a partisan election and those running in nonpartisan elections. Labeling a fee a "tax" does not illuminate the issues or direct a result. The state's interests furthered by assessment of a fee apply equally to judicial candidates. The qualification requirements urged as effectively restricting the ballot can be met by many of the thousands of attorneys practicing in the State of Florida and we cannot say the legislature was acting without a rational basis in imposing the fee on judicial candidates. If these candidates were seriously hampered in their ability to solicit funds—which we doubt in view of the obvious success of the named plaintiffs and the class of over 500 they represent, who actually paid fees totaling $887,400 —they could have been exempted on a claim of indigency under the order in *Fair*.

■ We decline to consider other issues raised for the first time on appeal.[9]

Affirmed.

---

7. Apparently a reference to the Code of Ethics and the Code of Professional Responsibility, applicable to members of the integrated Florida Bar, adopted by the Supreme Court of Florida, In Re the Integration Rule of the Florida Bar, 235 So.2d 723 (Fla.1970). The Florida Supreme Court has later promulgated a Code of Judicial Conduct, see 281 So.2d 21 (Fla.1973).

8. Restricting the activities permitted to candidates for judicial office. See, specifically §§ 105.071 and 105.08.

9. Plaintiffs advanced for the first time by their brief on appeal and during oral argument a second ground of attack on the fees assessed judicial candidates. They contend that judicial candidates were denied equal protection because they were forced to pay a flat 5% fee while candidates for nonjudicial office only paid 3%. We note that candi-

dates running in partisan elections were also subject to an additional 2% assessment "unless made less by the executive committee" of their respective parties. Fla.Stat. Sec. 99.092. Plaintiffs disclaim any challenge to the fees channeled to the political parties. We understand their complaint to be that judicial candidates were assessed 5% but nonjudicial candidates might have been assessed less than 5%, and that the potential for any such difference was arbitrary.

Plaintiffs do not allege that any nonjudicial candidate in fact paid less than 5%, nor are we able to gather from the record any indication that this occurred during the 1972 elections.

In any event, as the text indicates, we decline to consider this issue, raised for the first time on appeal and never alluded to or developed before the trial court.